**Bernard L. HERRO, Plaintiff,**

v.

**CITY OF MILWAUKEE, Thomas Nardelli, Paul Henningsen, Donald Richards, and Annette Scherbert, Defendants.**

**Civ. A. No. 91–C–756.**

United States District Court,
E.D. Wisconsin.

April 5, 1993.

---

Deborah S. Herro, Milwaukee, WI, for plaintiff.

Thomas J. Beamish, Ass't. City Atty., Milwaukee, WI, for defendants.

## DECISION AND ORDER

REYNOLDS, Senior District Judge.

In his amended complaint, filed August 19, 1991, plaintiff Bernard Herro ("Herro") claims that defendants, the City of Milwaukee and several of its alderpersons, denied him equal protection of the laws by rejecting his application for a tavern license for certain premises nine months before granting a tavern license for the same premises to another person. These actions are said to have violated both the Fourteenth Amendment and Article I, Section 1, of the Wisconsin Constitution.

On July 30, 1991, defendants filed a motion to dismiss for failure to state a claim, and on July 15, 1992, filed a motion for summary judgment. For reasons stated below, both motions are denied. Jurisdiction in this court is based upon 28 U.S.C. §§ 1343 and 1367.

## FACTS[1]

On June 26, 1987, Herro filed an application to operate a tavern at 645 North 7th Street in Milwaukee, the site of a building which he had leased for that purpose and

---

1. Unless otherwise indicated, what follows is based on the parties' statements of fact and supporting materials.

which had been covered by a tavern license for the previous forty-five years. The application was to be considered first by the Utilities and Licensing Committee ("the Committee") of the Milwaukee Common Council ("the Council"). At the time, the Committee's members included defendants alderpersons Thomas Nardelli ("Nardelli"), Donald Richards ("Richards"), Annette Scherbert ("Scherbert"), and Paul Henningsen ("Henningsen"), in whose aldermanic district the proposed tavern was located. A fifth committee member, alderperson Chris Krajniak ("Krajniak"), is not a defendant in this case.

In July 1987, during a hearing on Herro's application, the Committee decided, at Henningsen's urging, to withhold consideration of the application until Herro could address the problem of the building's "poor" condition. Herro and Henningsen met in September 1987 and discussed the possibility of improving the building's condition. In an October 5, 1987 letter, Henningsen informed Herro that he would oppose Herro's application because of the "over-concentration of taverns/liquor outlets in the area" and because of the inferior quality of the building. (Aug. 11, 1992 Deborah Herro Aff., Ex. E.) Another hearing on the application was scheduled for February 1988, but was then canceled because of the likelihood that the application would be denied. The next hearing, scheduled for March 1988, was also canceled, this time at Henningsen's request.

In June or July 1988, Henningsen informed Sidney Goldberg ("Goldberg"), owner of the building leased by Herro, that he and Herro should discuss the application with members of the West End Association ("the Association"), which, according to Henningsen, had expressed concern over the concentration of taverns in the downtown area. Goldberg and Herro met with the Association and learned that it did not object to Herro's application. From that point on, Henningsen did not respond to Herro's requests for a meeting. On September 12, 1988, the Committee held a hearing on Herro's application and decided, four to one, to recommend that the Council deny the application on the ground that there was "[e]xcessive concen-

tration of alcoholic beverage outlets in the vicinity of" the proposed tavern. (Deborah Herro Aff., Ex. G.) Henningsen, Nardelli, Richards, and Scherbert recommended denial, while Krajniak recommended that the application be granted. Herro claims the Committee heard no evidence at the hearing concerning the concentration of taverns and such in the downtown area. (Pl.'s Proposed Statement of Facts at ¶ 21.) Defendants say evidence on that subject was heard. (Aug. 27, 1992 Henningsen Aff. at ¶ 6.)

On September 20, 1988, the Council adopted the Committee's recommendation and denied Herro's application.

Sometime after that, Ralph Henry ("Henry") applied for a tavern license covering the very building for which Herro had sought a license. On May 23, 1989, the Committee, whose members now included Nardelli, Richards, and Scherbert, but not Henningsen, voted to recommend that Henry's application be granted. The Council adopted this recommendation and granted Henry's application on June 6, 1989. Herro claims that neither the concentration of taverns in the area nor the condition of the building substantially changed between the date his application was denied and the date Henry's was granted. (Pl.'s Proposed Statement of Facts at ¶¶ 29, 30.) Defendants, on the other hand, claim that "there had been a reduction in the number of licensed outlets in the vicinity" of Goldberg's building, and further claim that Henry had "developed a substantial plan for rehabbing the dilapidated property in question." (Henningsen Aff. at ¶ 7.)

## ANALYSIS

The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To withstand summary judgment, however, the nonmoving

party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The court must draw all reasonable inferences from the record in favor of the nonmoving party. *Johnson v. Pelker*, 891 F.2d 136, 138 (7th Cir.1989).

Defendants contend that Herro has not stated an equal protection claim, that he has not satisfactorily alleged the existence of a discriminatory policy or custom sufficient to hold Milwaukee liable, and that the individual defendants are entitled to legislative or quasi-judicial immunity for their actions. The court will address each of these arguments in turn.

### I. The Equal Protection Claim

 Herro does not claim to have been the victim of a "suspect classification" that would require the court to apply some heightened level of scrutiny. Nor does Herro claim that defendants discriminated against him with respect to a fundamental right. While denial of his application seriously restricted his ability to run a tavern, the equal protection clause does not create a fundamental right to engage in a particular line of work. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976).[2] Thus, the actions Herro protests are subject to the most lenient standard of review. The court asks only whether the challenged classification rationally relates to a legitimate state interest, and the burden is on Herro to prove that it doesn't. *DeSalle v. Wright*, 969 F.2d 273, 275 (7th Cir.1992).

Defendants contend that the court need not even consider the rationality of their actions, because Herro has failed to set forth a basic element of an equal protection claim, namely, discrimination on the basis of membership in some group or class. In *New Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1481–82 (7th Cir.1990), upon which defendants principally rely, the court held that applicants for a building permit, who merely alleged that an adjacent landowner had been given preferential treatment in his permit application, failed to state an equal protection claim because they had not alleged group- or class-based discrimination. The court stated, "Discrimination based merely on *individual*, rather than group, reasons will not suffice." *Id.* (emphasis in original).

This seems to be another way of saying that the plaintiff cannot simply claim to have been treated differently than another person, but must identify the stated or perceived basis for the differential treatment. If no such basis is identified, then presumably the plaintiff cannot meet his burden of demonstrating that the basis was irrational. In perhaps the majority of cases, the group discrimination requirement poses no real obstacle, because the plaintiff seeks to prove a specific type of discrimination, such as racial discrimination, or because the basis of discrimination is plain from the face of the governmental action, as in a statute prohibiting those convicted of felonies, but not those convicted of misdemeanors, from obtaining a license to sell guns.

But the group discrimination requirement does pose a problem in cases such as this one, where the plaintiff has no way of knowing the basis of the challenged discrimination because it occurs not in a single piece of legislation, with classifications all spelled out, but in a series of unconnected actions taken over a period of time. When the government decides to grant or not to grant an individual license or other entitlement, it does not normally check that decision against every previous decision it has made, nor is it required to, and so inconsistencies inevitably go unexplained. *See Seven Star, Inc. v. United States*, 873 F.2d 225, 227 (9th Cir.1989) ("[a] decision by an administrative agency in one case does not mandate the same result in every similar case in succeeding years.") And yet certainly there may be cases in which the inconsistency is so obvious and avoidable that it cannot be written off as a minor administrative variation or as an instance of the government unwittingly chang-

---

**2.** In this sense, the equal protection clause differs somewhat from the privileges and immunities clause of Article IV, which prevents a state from restricting, without a good reason, the ability of non-residents to do business in the state. *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 279, 105 S.Ct. 1272, 1275, 84 L.Ed.2d 205 (1985).

ing its mind. In those cases, to require the affected person to set forth the basis of the differential treatment, when in fact its basis is unstated and unfathomable, is to insulate from judicial review what may be a truly irrational classification.

The question is how to avoid that result and yet require, as *New Burnham* does, that the plaintiff do more than merely claim to have been treated differently than some other person. An answer readily presents itself in cases such as this one, where the government sets forth the factors underlying whatever adverse action was taken against the plaintiff. By setting them forth, the government is purporting to make a rational decision, so it makes sense to expect that if the same factors apply with equal force in a subsequent case, the government will reach the same conclusion in that case as it did in the plaintiff's case. If the plaintiff can show that factors described as conclusive in his case were disregarded in another, that should satisfy the initial burden of demonstrating that the government acted irrationally in treating the two cases differently.

In response, the government might explain why the factors it applied in one case did not lead to the same result in another. Or, if the factors really should have led to the same result, the government can explain why it changed its mind from one case to the next, for it is free to do so. *Seven Star*, 873 F.2d at 227. The government's explanation will not be rigorously examined—it need only be not irrational—but at least there will be some explanation given for seemingly irreconcilable decisions.

■ Unlike the plaintiffs in *New Burnham*, Herro does not merely claim to have been treated differently than some other person. Rather, he has shown that the adverse action taken against him was purportedly based on just two concerns—the condition of the building he had leased and the concentration of taverns in the area of the building— and that each of those concerns applied with equal force ninth months later when Henry's application was granted for the same building. Thus, according to the standards discussed above, Herro has made a prima facie showing that defendants acted irrationally,

and therefore an explanation from them is in order.

They finally get around to offering one in an affidavit submitted along with their reply brief in support of the summary judgment motion. In the affidavit, Henningsen states that in the eight months following denial of Herro's application, "there had been a reduction in the number of licensed outlets in the vicinity" of the proposed tavern. (Henningsen Aff. at ¶ 7.) Henningsen further states that "Henry had also developed a substantial plan for rehabbing the dilapidated property in question." (*Id.*) The problem is that defendants have not claimed that the tavern concentration decreased in any meaningful way and have not introduced evidence showing that it decreased at all, while Herro has submitted a mass of raw data showing, he says, that any changes in tavern concentration were insignificant. Further, no specifics concerning Herro's and Henry's respective rehabilitation plans have been submitted, so the court is unable to compare them.

There remains, therefore, a genuine issue of fact as to whether the stated reasons for denial of Herro's application should have similarly affected Henry's application. Thus, on the record now before the court, summary judgment on the merits of Herro's claim is not appropriate.

## II. Municipal Liability

Defendants assert that Milwaukee can be held liable in this case only if Herro establishes that the city had a general "custom or policy" of acting upon license applications in the discriminatory manner of which he complains. But that is not the law. Rather, Milwaukee's liability under 42 U.S.C. § 1983 depends on whether the acts which form the basis of Herro's claim represent official Milwaukee policy, or whether, instead, they are merely the unapproved acts of its employees. *Pembaur v. Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). By definition, when Milwaukee's properly constituted legislative body, the Council, acts on a license application as it has in this case, the action is official Milwaukee policy. *Id.* at 480, 106 S.Ct. at 1298. Thus,

Milwaukee may be held liable for such action if it turns out to be unconstitutional.

## III. Immunity

■ The individual defendants contend that their liquor licensing decisions are protected by either legislative or quasi-judicial immunity. With respect to the former, the question is whether the licensing decision was truly "legislative," in which case immunity arises, or "administrative," in which case it doesn't. *Rateree v. Rockett,* 852 F.2d 946, 949 (7th Cir.1988). The difference between the two is self-evident. Legislative action involves the making of law for general application, and administrative action involves the application of law in a particular case. As a general matter, the denial of an individual license involves only the application of law and thus does not give rise to legislative immunity. *Yeldell v. Cooper Green Hosp.,* 956 F.2d 1056, 1062 (11th Cir.1992); *Polenz v. Parrott,* 694 F.Supp. 599, 601 (E.D.Wis.), *aff'd in part, rev'd in part on other grounds,* 883 F.2d 551 (7th Cir.1989). In *Polenz,* Judge Gordon declined to apply legislative immunity to an alderman's decision denying a liquor license.

With *Polenz,* contrast *Reed v. Village of Shorewood,* 704 F.2d 943, 952–53 (7th Cir. 1983), where a local liquor control commissioner was held to be entitled to legislative immunity for his decision reducing the number of available liquor licenses from four to three. The intended effect of the decision was to deprive a specific applicant of a license, but the commissioner did so by changing the law, not by merely applying it in a particular case. Thus, the decision was properly characterized as legislative.

■ The instant case, however, like *Polenz,* involved no law-making. Herro's application was denied, and Henry's granted, through the use of preexisting standards and procedures. It was administrative action and therefore did not give rise to legislative immunity.

■ Nor are defendants entitled to quasi-judicial immunity. That form of immunity applies to officials who, though not judges, act like judges. *Reed,* 704 F.2d at 952. Officials are held to act more like judges if they base their decisions on law, make findings only after notice and hearing, make a written record of all evidence presented at the hearing and of the proceedings in general, and make decisions that are subject to appellate review. *Butz v. Economou,* 438 U.S. 478, 513, 98 S.Ct. 2894, 2914, 57 L.Ed.2d 895 (1978); *Reed,* 704 F.2d at 951–52. In some ways, the individual defendants in this case do conduct proceedings that look judicial. The Committee's decision is made after notice and hearing and must be based on evidence presented at the hearing, and both direct- and cross-examination of witnesses is permitted. Milwaukee Code of Ordinances § 90–5–8(b), (c). Further, the Committee's decision apparently is subject to review in the Milwaukee County Circuit Court. Wis. Stat.Ann. § 125.12(2)(d).

Significantly, however, it does not appear that the Committee keeps or is required to keep a written record of the evidence presented at its hearings, making impossible any meaningful sort of appellate review. And yet a critical reason for granting quasi-judicial immunity is that the decision-maker's "wrongs are largely remediable through the appellate process." *Reed,* 704 F.2d at 952. The Committee's decision, furthermore, may be based on "evidence" concerning an effectively unlimited range of factors. Committee members may consider:

The appropriateness of the location and premises to be licensed.

Whether such location will create undesirable neighborhood problems.

Whether there is an overconcentration of licensed establishments in the neighborhood.

Whether or not the applicant has been charged with or convicted of any felony, misdemeanor, municipal offense, or other offense, the circumstances of which substantially relate to the licensed activity.

Any other factors which reasonably relate to the public health, safety and welfare. Milwaukee City Code of Ordinances § 90–5–8(c). The fairly unbounded nature of the Committee's inquiry distinguishes it from anything that can properly be termed "judicial," and distinguishes it as well from the facts of

*Reed,* where the liquor commissioner was granted judicial immunity in part because he could not revoke a license "without finding that the licensee has violated the law." *Reed,* 704 F.2d at 951.

Because these basic safeguards of the judicial process are missing from the Committee's licensing hearing, the court concludes that defendants are not entitled to judicial immunity.

IT IS THEREFORE ORDERED that defendants' July 30, 1991 motion to dismiss is DENIED.

IT IS FURTHER ORDERED that defendants' July 15, 1992 motion for summary judgment is DENIED.